# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| **E.M. SERGEANT PULP & CHEMICAL CO., INC. and SERGEANT CHEMICAL CO.,** | : : : : | Civ. No. 12-1741 (KM) (JBC) |
| **Plaintiffs,** | : : | **OPINION** |
| **v.** | : : : | |
| **THE TRAVELERS INDEMNITY CO. INC. and COLUMBIA INSURANCE CO.,** | : : : : | |
| **Defendants.** | : : | |

Plaintiff E.M. Sergeant Pulp & Chemical Co., Inc. ("EMS") seeks coverage and defense costs for environmental pollution claims pursuant to insurance policies allegedly issued by Travelers Indemnity Company, Inc. ("Travelers"). Now before the court is Travelers' motion for summary judgment. (ECF no. 109) The key issue on the motion is whether, for the period 1943–64 (or some part of it), EMS had a policy of insurance with Travelers covering property damage.

Environmental cleanup liability has the longest of long tails. When claims are brought, sometimes decades after the fact, it is common to find that witnesses or records have disappeared. The unavailability of records, while perhaps convenient for the potentially liable insurer, does not imply bad faith or fault. The actors may have discarded records because they never anticipated liability at all,[1] or because they assumed that any relevant statute of limitations had expired long ago.

Here, certain business records indicate that EMS had coverage in the relevant period, but the policies themselves cannot be located. Nevertheless, the indirect evidence of coverage, and the clash of expert opinions about it, is

---

[1] Consider, for example, that in 1964, the last date at issue in this case, the creation of the EPA still lay some six years in the future.

1

barely sufficient to create a triable issue. I will therefore, for the most part, deny Travelers' summary judgment motion.

## I.   BACKGROUND

### A.   The Site and the EPA Claims Leading to This Action

There is little dispute as to certain general background facts.[2] Plaintiff EMS is a distributor of heavy industrial inorganic chemicals and raw materials,

_____

[2]   In this Opinion, certain record items are abbreviated as follows:

Def. Br. = Travelers' Brief on the motion (ECF no. 109-1)

Pl Br. = EMS's Brief in response to the motion (ECF no. 115)

Def. Reply = Travelers' Reply Brief (ECF no. 117)

TSMF = Travelers' Local Rule 56 Statement of Material Facts (ECF no. 109-4)

Ledger Pages = four handwritten ledger pages dating from 1947–48, 1948–49, 1949–50, and 1963–64, consisting of:

"Ledger 529" (Maloney Dec. Ex. I, ECF no. 109-3 at 16)

"Ledger 554" (Maloney Dec. Ex. J, ECF no. 109-3 at 18)

"Ledger 560" (Maloney Dec. Ex. K, ECF no. 109-3 at 20)

"Ledger 1362" (Maloney Dec. Ex. L, ECF no. 109-3 at 22)

Fireman's Note = handwritten note stating "Travelers previously on line for about 40 years" (Maloney Dec. Ex. M, ECF no. 109-3 at 24);

Fireman's Application = 1964 application for excess insurance to Fireman's Fund (Maloney Dec. Ex. N, ECF no. 109-3 at 26);

Gilbert Aff. = Affidavit of Jennifer Gilbert, Fireman's Fund Claim Specialist (Maloney Dec. Ex. Q, ECF no. 109-3 at 64)

Travelers Policy Forms = Samples of forms used by Travelers in the relevant period (Maloney Dec. Ex. R, ECF no. 109-3) (under seal; submitted separately).

Robertson Rpt = Rebuttal Report of Travelers' Expert James A. Robertson (Maloney Dec. Ex. T, ECF no. 109-3 at 83)

EMS Response = EMS's Response to TSMF, *supra* (ECF no. 115-15)

ESMF = EMS's Local Rule 56 Supplemental Statement of Material Facts (ECF no. 115-16)

Tomaszewski Dec. = Declaration of Eric E. Tomaszewski, with attached Exhibits (ECF no. 115-1)

Booth Rpt = Declaration of EMS's expert, Henry R. Booth (Tomaszewski Dec. Ex. J, ECF no. 115-11)

including nutraceutical and pharmaceutical products. EMS owned a piece of real estate located at 120 Lister Avenue in Newark, New Jersey, from 1942 to 1984. For much of that time, EMS leased the property to Sergeant Chemical Company ("SCC"), a now-defunct company that was a distributor of heavy industrial chemicals.

In 2004, EMS was notified by the United States Environmental Protection Agency ("EPA") that it was a Potentially Responsible Party ("PRP") with respect to the Lower Passaic River Study Area, part of the Diamond Alkali Superfund Site. In February of 2009, EMS was named as a Third-Party Defendant in a lawsuit for property damage caused by environmental pollution from the 120 Lister Avenue property.

Faced by potential cleanup liability, EMS conducted a historical search for insurance policies that might have been in effect at the time of the alleged polluting activities. The upshot was that EMS filed claims with Travelers and Columbia for coverage and defense, alleging that those insurers had issued policies to EMS and SCC in various years from 1943 to 1964. Travelers denied coverage, saying it had no relevant policy in effect at the time.

Hence this lawsuit.

**B.    Procedural History**

EMS and SCC filed the complaint in this action against Travelers on January 18, 2012, in Superior Court of New Jersey, Bergen County.[3] (ECF No. 1) On March 20, 2012, Travelers removed the action to federal court, invoking

---

Booth Dep. = Deposition transcript of Henry R. Booth (Excerpts at Tomaszewski Dec. Ex. K, ECF no. 115-12; further excerpts at Maloney Dec. Ex. H, ECF no. 109-3 at 28)

[3]    The complaint announces at the outset that it is one for a declaratory judgment. The causes of action for breach of contract, however, state that they seek compensatory and punitive damages.

The complaint named a second defendant, Columbia Insurance Company. Columbia has never been served or appeared in this action. Additionally, by Consent Order, SCC, a defunct entity, was terminated as party plaintiff on May 14, 2012. (ECF No. 11) This is now an action between EMS and Travelers.

this Court's diversity jurisdiction under 28 U.S.C. § 1332. (*Id.*) Discovery commenced in June 2012 and closed on May 14, 2014. (ECF No. 17)

Travelers' original motion for summary judgment was filed on June 16, 2014. (ECF No. 60) In opposition, EMS proffered the report of a previously-undisclosed expert, Henry R. Booth. I denied Travelers' motion to strike Booth's report, but I reopened discovery, permitted Travelers to proffer its own expert in rebuttal, and awarded Travelers the costs occasioned by EMS's failure to abide by discovery rules and orders. (ECF nos. 100, 101)[4]

That additional expert discovery has now taken place. Travelers has filed a revised motion for summary judgment (ECF no. 109), EMS has filed an opposition (ECF no. 115), and Travelers has filed a reply (ECF no. 117). The matter is fully briefed and poised for decision.

### C.   EMS's Evidence of Insurance Coverage

Discovery in this action has focused on the issue of whether there was a Travelers policy that covered property damage claims in the relevant period.

Neither EMS nor Travelers, despite diligent efforts, has been able to locate any relevant policy. (TSMF ¶ 10; ESMF ¶¶ 19, 22) Assuming a policy existed, neither possesses any direct evidence of what its terms were. (TSMF ¶ 10)

The indirect evidence of coverage offered by EMS does not include the testimony of percipient witnesses. All persons associated with EMS during the relevant period are now deceased. (TSMF ¶ 8) EMS's insurance broker at the time, William Stake & Company, is long defunct. EMS has not been able to ascertain the location of the broker's files or contact any of its former employees. (TSMF ¶ 9)

EMS's executive vice president and Rule 30(b)(6) witness, Scott Reisch, confirmed that EMS possesses no direct proof of coverage. (TSMF ¶ 11) So did EMS's counsel, Daniele Cervino, who coordinated EMS's search for historical

---

[4]     I did not, however, sanction EMS's current attorney, Mr. Tomaszewski, who inherited the situation from previous counsel.

insurance information. (TSMF ¶ 12) EMS admits that it does not possess any information or documents referring or relating to the limits of liability or terms and conditions of any insurance policies allegedly issued by Travelers. (TSMF ¶ 10) Reisch and Cervino acknowledge that they do not know whether any missing Travelers policy was a primary policy. (TSMF ¶ 13)

EMS did, however, uncover certain documents which, it claims, indirectly prove that it had property damage coverage from Travelers in the relevant period. I summarize the contents of these documents, supplemented by deposition testimony about them.

1.   The Ledger Pages

The Ledger Pages are four in number. Three are identified as records of SCC; one is a record of EMS. They contain debit and credit entries.

The first page (designated "Ledger 529") contains three debit entries that refer to Travelers, dating from 1948–49:

| | |
|---|---|
| November 24, 1948 -- | Travelers #62095<br>W.C. 12/1/48-12/1/49 |
| January 7, 1949 -- | Travelers HP81724<br>1/13/49-1/13/50 Tenants Liability |
| February 21, 1949-- | Travelers UB2458520<br>12/1/47-12/1/48 Additional |

Albert Reisch, EMS's president since 1975, and Scott Reisch, its executive vice president, confirmed in depositions that EMS possesses no further information about these entries. Albert Reisch could not say whether they related to EMS or to SCC. (TSMF ¶ 21) Reisch and Cervino assert that EMS and SCC, as landlord and tenant, had a practice of purchasing insurance together. (ESMF ¶15) Although Albert and Scott Reisch believe these entries refer to Travelers policies, neither could say what type of policies they were. Scott believes "W.C." in entry [a] might have stood for Workers Compensation, but neither knows what "Tenants Liability or "Additional" meant. (TSMF ¶ 21)

The second page (designated "Ledger 554") contains two credit entries that refer to Travelers, dating from 1964:

| | |
|---|---|
| May 13, 1964   -- | Travelers Public Liability |

KDS 1747699 4/6/64-4/1/65

June 11, 1964  --      Travelers 12389
                       KDS 822846 4/1/63-4/1/64

EMS's representatives, Albert and Scott Reisch, again had no information to offer about the meaning of these entries. They could not tell whether they related to EMS or to SCC. (TSMF ¶ 24)  Assuming the entries relate to policies of insurance, the Reisches did not know what kind of policies they were; and they could not say what "Public Liability" might mean. (TSMF ¶ 24)

The third page (designated "Ledger 560") contains one credit entry that refers to Travelers. The year of the actual entry is unclear, although the substance of the entry refers to 1963:

August 30 [no year]   -- William Stake (Refund Travelers Ins.
                         DS 179924 4/1/63
                         Audit Mfrrs. Liability

William Stake, recall, is the name of a now-defunct New York insurance brokerage, whose records and ex-employees cannot now be located. EMS's representatives, the Reisches, again could not say what kind of insurance might be referred to. They had no familiarity with "Mfrrs. Liability." (TSMF ¶ 28) Cervino testified that she believed the abbreviated "Manufacturers" reference indicates that this entry related to SCC. (TSMF ¶ 29)

The fourth page (designated "Ledger 1362") contains four entries, dating from 1949–1950, that refer to Travelers. The first two are debit entries, and the last two are credits:

April 16, 1949 --        4/1/49–4/1/50 Travelers
                         DS 330528 (Chlorine)

September 22, 1949 -- 4/1/48–4/1/49 audit 79 [illeg.]
                         Travelers DS 2646587 (Chlorine)

January 6, 1949   --     Refund Travelers
                         WC Policy NJUB2640541
                         Cancelled 10/9/48

August 25, 1950 --       330528 Travelers
                         4/1/49–4/1/50 Refund

Scott Reisch, though not certain, believed Ledger 1362 related to SCC. He believed that the reference to "Chlorine" indicated "a form of insurance against a potential problem with chlorine . . . something very specific to do with that piece of [SCC's ] operation." (TSMF ¶ 32) Cervino concurred that "Chlorine" probably related to a "special risk policy stand-alone for [SCC's] chlorine operation." (TSMF ¶ 33) Scott Reisch believed that "WC" probably referred to Workers' Compensation. (TSMF ¶ 32)

### 2.   The Fireman's Application

EMS submits a copy of a 1964 application (designated the "Fireman's Application") submitted to Fireman's Fund. The application, author unknown, was submitted jointly on behalf of EMS "and/or" SCC. It is an application for excess insurance. The primary insurer is listed as "Insurance Co. of NA."

Under "Losses–latest 3 years," the application disclosed three. All involve bodily injury.[5] None involves property damage loss. Only the third disclosed prior loss refers to Travelers. It reads as follows:

> In 1958 employee of client of assured sustained eye injury. Settled in 1963 by Travelers Ins Co for $35,000.

The "assured" is not further identified as EMS or SCC. (TSMF ¶ 44)

### 3.   The Fireman's Note

EMS submits a note (designated the "Fireman's Note"), which it says relates to its 1964 application for excess insurance from Fireman's Fund, described in the preceding section. The note reads, in its entirety:

> I.N.A. presently binding high limits.
>
> Travelers previously on line for about 40 yrs –
>
> Cancelled out because of 1963 losses and payment of $35,000 made in 1963 on 1958 claim.

---

[5]      The first, dating from July 1963, involved injury to five people from smoke following after a fire set off by an exploding drum of pitch. The second, dating from September 1963, involved injury to a Curtiss-Wright employee from chlorine.

Sales about 1,000,000[6]

EMS did not take any deposition discovery with respect to the Fireman's Note. The Note was produced in a batch of papers represented to be Fireman's underwriting file. (Tomaszewski Dec. Ex. F, ECF no. 115-7) Otherwise, its provenance is hazy. Travelers submits an affidavit from a representative of Fireman's Fund, who states that she has no relevant information about the origin of the note. (Gilbert Aff. ¶¶ 3, 4) EMS does not know who drafted the Note. EMS has no further explanation of the reference to "40 years" (which would stretch back to 1924), and cannot state precisely what was meant by "on line." Assuming that the Note refers to a past Travelers policy of insurance, EMS does not know what kind of insurance it was. (TSMF ¶ 38 & n.8)

### 4.   Travelers Policy Forms and Related Deposition Testimony

On the Ledger Pages described above, there are references to Travelers in proximity to what appear to be letter prefixes (HP, DS, and KDS) followed by policy numbers. EMS took discovery from Travelers and obtained certain standard policy forms relating to prefixes HP, DS and KDS. (These standard forms are designated as the "Travelers Policy Forms".) The HP, DS, and KDS prefixes are used in Travelers policies that, at least potentially, could provide coverage for property damage, bodily injury, and in some cases medical payments.[7] (TSMF ¶ 48)

Robert J. Harris, Second Vice President in Travelers' Special Liability Coverage Unit, was deposed. The Travelers KDS policies, said Harris, were a form of commercial liability policy known as "manufacturers and contractors liability" policies. The KDS forms produced by Travelers were used from 1940 to 1955, but were modified in 1955. (ESMF ¶ 25) The Travelers DS policies,

---

[6]      It is inferable that "INA" refers to the Insurance Co. of North America, the primary insurer listed in the Fireman's Application for excess insurance, *supra*. The "payment of $35,000 made in 1963 on 1958 claim," says EMS, refers to the same eye injury claim disclosed in the Fireman's Application, *supra*.

[7]      Everyone agrees that a fourth prefix, UB, relates solely to workers' compensation, and I do not discuss it further.

according to Harris, were similar to KDS policies, except in the manner they treated bodily injury. (ESMF ¶ 26) The Travelers HP policies, known as "owners, landlord and tenants' liability" policies, were issued with respect to designated premises. The same HP form was in use from 1940 to 1955. (ESMF ¶ 27) Harris acknowledged that before 1970, its policies (including KDS, DS, and HP policies) would not routinely have contained a pollution exclusion. (ESMF ¶ 28)

Harris explained that the Travelers Policy Forms were like an à la carte menu, from which a policy could be assembled. Coverages are selected by choosing one or more of such forms. The policy is then endorsed[8] (TSMF ¶ 50), and the result of the whole underwriting process is reflected on a declarations page. Without knowing what forms were selected and how the policy was endorsed and underwritten, it is not possible to define what the coverage was. For example, it cannot be determined whether property damage options were selected, and if so, what the limitations and endorsements might have been. (TSMF ¶ 51) As Harris put it, "[y]ou can't reverse engineer and get to the declarations pages' content. You just have to have the declarations page." (TSMF ¶ 52).

---

[8]     An endorsement is defined as follows:

> An insurance policy form that either changes or adds to the provisions included in one or more other forms used to construct the policy, such as the declarations page or the coverage form. Insurance policy endorsements may serve any number of functions, including broadening the scope of coverage, limiting or restricting the scope of coverage, clarifying the application of coverage to some unique loss exposure, adding other parties as insureds, or adding locations to the policy. They often effect these changes by modifying the existing insuring agreement, policy definitions, exclusions, or conditions in the coverage form or adding additional information, such as insured locations, to the declarations page.

Insurance Risk Management Institute, Glossary of Insurance & Risk Management Terms, https://www.irmi.com/online/insurance-glossary/terms/e/endorsement.aspx (visited Jan. 13, 2017).

### D.   Expert Opinions

1.   Booth

Henry R. Booth, an independent consultant, has 30 years' experience in the field of "insurance archaeology"—that is, reconstructing and auditing the insurance coverage of yore. Many of his cases have involved environmental claims and lost policies. In particular, Booth has reviewed historical Travelers policies in the course of some twenty-five separate engagements. His opinions here are based on the application of his expertise to the secondary evidence summarized above. Those opinions are contained in his declaration, as supplemented by his deposition testimony.

Mr. Booth observed that Ledger 529 was contained in the records of EMS itself. From his familiarity with Travelers prefixes and policy numbers, he recognized the "Travelers HP 81724" as an "owners, landlords, and tenants" policy issued by Travelers. From the presence of the notation in an EMS ledger, he concluded that the policy was issued to EMS.

Mr. Booth observed that Ledgers 554, 560, and 1362 were contained in the records of SCC. He recognized the Travelers DS and KDS policy number prefixes as "manufacturers and contractors" policies, and concluded from their presence in the SCC records that Travelers had issued these policies to SCC.

Mr. Booth opined that the policies, irrespective of whether they were evidenced by the records of EMS or SCC, applied to both entities.

The kind of "owners, landlords, and tenants" policies referred to in EMS's Ledger 529, for example, typically provide coverage for liability arising from the ownership, maintenance or use, for the purposes stated in the declarations of the policies, of the insured's business premises and all operations during the policy period which are necessary or incidental to such purposes. Thus, said Booth, it would cover not just EMS but the activities of SCC while it conducted its operations at the premises from 1942 to 1980. The "premises," he concluded, were extremely unlikely to have been confined to EMS's front-office operation at 7 Dey Street in New York City.

The DS and KDS "manufacturers and contractors" policies referred to in the SCC ledgers, Mr. Booth opined, typically provide coverage for liability arising from the ownership, maintenance or use of premises. These would therefore have covered SCC's operations.

Mr. Booth also concluded that EMS would have been a named insured or an additional insured on the DS/KDS policies referred to in the SCC Ledger Pages. He based that conclusion on two factors:

(i) Documented coverage (*i.e.,* the INA/Fireman's Fund policies) in effect after 1964 identifies both EMS and SCC as named insureds;

(ii) it is "standard practice" for a commercial tenant to name the property owner as an additional insured on a liability policy.

Mr. Booth expressed the opinion that the missing Travelers policies provided coverage for public liability, including both third-party bodily injury and property damage. He considered it possible but unlikely that SCC or EMS would obtain coverage only for bodily injury. Only where a broker advised that the property damage risk was minuscule would an insured decline coverage. Given the chemical business of EMS and SCC, the risk of property damage would not be minuscule. An alternative scenario—that EMS purchased bodily injury coverage from Travelers, but obtained property damage coverage elsewhere—Booth considered "extremely unusual," and he saw no evidence of it.

Next, Mr. Booth concluded that the Travelers coverage was continuous from April 1, 1948 through April 6, 1965. He acknowledged that the Ledger Pages showed entries for only 1948–50 and 1963–65. His conclusion that coverage was continuous rested on four factors:

(i)   The two 1964 Fireman's documents refer to a 1958 bodily injury claim settled by Travelers for $35,000 in 1963 (which led Travelers to cancel);

(ii)   The Fireman's Note says that Travelers was "previously on line" for 40 years;

(iii)    The "bookend" coverage in 1948–50 and 1963–65 suggests that there was coverage in the interim, because, in Booth's experience, Travelers did not usually "come in and out of a risk."

(iv)    References in the Ledgers to other insurers, Columbia and Royal, did not indicate that those carriers covered third-party liabilities, but rather first party property damage (fire or buildings) and workers' compensation.

Finally, Mr. Booth concluded that the missing Travelers insurance had policy limits of $25,000. That conclusion rests on three factors:

(i)    The replacement INA coverage that EMS obtained in 1964 was in that amount;

(ii)    In Booth's experience, liability limits tend to be static from one year to the next;

(iii)    Travelers' expert, Robertson, testified that typical limits in that period were as high as $5,000.00 per accident and $25,000 in the aggregate.

### 2.    Robertson

Because Travelers is the movant, and inferences are to be drawn in favor of the nonmovant, Travelers has not emphasized the testimony of its own rebuttal expert. I nevertheless summarize it here.

James A. Robertson, CPCU, ASRM, is a well credentialed and experienced consultant in the field of insurance coverage. (Robertson Rpt 15–17) Mr. Robertson, as a matter of expert opinion, confirmed much of what was testified to by Harris on behalf of Travelers. The existence and scope of coverage cannot be known definitively without information about the declarations, underwriting, endorsements, etc. Ledger notations do not create, or even adequately describe, coverage. (Robertson Rpt at 4; *see also* 12–15)

Ledger 1362, from the records of SCC, contains four references to a Travelers policy number, DS 264587 (eff. 1948–49). This would be a

Manufacturers and Contractors (M&C) liability policy. References to Chlorine suggest that this covered SCC's operations. (Robertson Rpt 4–5)

Ledger 529, from the records of EMS, contains references to a Travelers policy number, HP 81724 (eff. 1949–50). This would be a owner, landlord, and tenant ("OL&T") policy. The entry says nothing about dates, terms, conditions, limits, endorsements or types of liability coverage. An essential element of an OL&T policy—the identification of the insured location—does not appear. (Robertson Rpt 5–6)

Ledger 1362, from the records of SCC, refers to a Travelers M&C policy number, DS 330528 (eff. 1949–50). References to Chlorine suggest that this was stand-alone coverage for SCC's operations.

The minimum basic limits of coverage in the 1940s were $5,000 per person/$10,000 per accident (bodily injury) and $1000 per accident/$10,000 aggregate (property damage). (Robertson Rpt 5, 6, 7)

Ledger 560, from the records of SCC, refers to a Travelers M&C policy number, DS 179924 (eff. 1962–63). Ledger 554, from the records of SCC, refers to two Travelers M&C policy numbers, KDS 822846 (eff. 1963–64) and KDS 1747699 (eff. 1964–65, possibly canceled). Robertson recites Booth's conclusion that the INA coverage replaced this Travelers M&C coverage in 1964. He notes the testimony of Cervino that EMS was not a manufacturer, a fact that suggests this coverage applied to SCC. (Robertson Rpt 7–8)

The minimum basic limits of coverage in the early 1960s were $5,000 per person/$10,000 per accident (bodily injury) and $5000 per accident/$25,000 aggregate (property damage). (Robertson Rpt 7–8)

Robertson confirms Harris's testimony that the Travelers Policy Forms are à la carte options, not proof of the coverage that was actually selected. The policy forms themselves undermine Booth's general opinion that both SCC and EMS would impliedly have been covered; the forms cover named insureds for listed hazards arising from scheduled operations. While SCC and EMS jointly purchased coverage from INA/Fireman's Fund in 1964, there is no evidence that had previously acted jointly, and their separate ledgers suggest that they

had not. The Fireman's Fund Application and Note are of unknown origin; in any event they establish at most that there was bodily injury coverage. Many companies did not purchase coverage for property damage in this era, because the risks were not then perceived as large. Robertson disagrees with Booth's opinion that endorsements excluding property damage coverage were rare. (Robertson Rpt 8–11)

Finally, the policy limits in the pre-1964 era were typically low. *See supra.* In 1964 EMS/SCC purchased replacement insurance with relatively low limits, corroborating the conclusion that any prior coverage had low limits as well. (Robertson Rpt 11–12)

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby,* Inc., 477 U.S. 242, 247–48, 106 S. Ct. 2505, 2509–10 (1986); *Kreschollek v. S. Stevedoring Co.,* 223 F.3d 202, 204 (3d Cir. 2000).

"When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact." *In re Bressman,* 327 F.3d 229, 238 (3d Cir. 2003) (quoting *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir. 1991)). That is, the moving party must demonstrate that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Id.*

On the other hand, "with respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S. Ct. 2548, 2554 (1986). If the nonmoving

party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23, 106 S. Ct. at 2552).

　　To demonstrate the existence of a genuine issue, a party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986). Likewise, "unsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990). Rather, a party must present evidence sufficient to create a triable issue. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510; *Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). By evidence, the Rule means "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). In construing such evidence, however, the court must draw inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998).

　　In deciding a motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 248–49, 106 S. Ct. at 2510. Credibility determinations are the province of the fact finder. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

EMS, named in a claim based on polluting activities 50–75 years ago, has undertaken a diligent search for any insurance policies that might then have been in effect. Any such policy, assuming it existed, is now missing. Nevertheless, EMS, citing indirect evidence, contends that it did have relevant policies of insurance with Travelers, and it seeks coverage under those missing policies. Travelers replies that such proofs are inadequate, and do not rise above the level of speculation.

### A.   EMS's Burden of Proof and its Evidence

"In coverage disputes, the insured party has the burden of showing that insurance coverage has been triggered." *Fed. Ins. Co. v. Cherokee Ardell, L.L.C.*, No. CIV.A. 08-2581, 2011 WL 1254036, at *15 (D.N.J. Mar. 28, 2011) (Wolfson, J.) (citing *Wurst v. State Farm Fire and Cas. Co.*, 431 F. Supp. 2d 501, 504 (D.N.J. 2006); *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009)). Most commonly, of course, the insured will base its claim on a policy which exists and can be introduced in evidence. That the policy cannot be found is not necessarily fatal to an insured's claim. A claim based on a missing policy does, however, present formidable difficulties of proof.

As to the existence and terms of a missing policy, the putative insured— here, EMS—has the burden:

> With respect to proof of the terms of the missing policies, the burden was upon plaintiff, as insured, initially to bring its claim within the coverage of the policy. *Diamond Shamrock Chemicals Co. v. Aetna Casualty & Surety Co.*, 258 N.J. Super. 167, 216, 609 A.2d 440 (App. Div. 1992), *certif. denied*, 134 N.J. 481, 634 A.2d 528 (1993).

*Borough of Sayreville v. Bellefonte Ins. Co.*, 320 N.J. Super. 598, 602, 728 A.2d 225, 227 (App. Div. 1998). *See also Kleenit, Inc. v. Sentry Ins. Co.*, 486 F. Supp. 2d 121, 125–26 (D. Mass. 2007) (Collings, U.S.M.J.) (under Massachusetts law, "the proponent of a lost insurance policy 'bears the burden of proving that the instruments were issued, and he must also prove their terms'") (citations omitted). That burden is proof by a preponderance of the evidence. *Id.* at 604,

728 A.2d at 228; *accord Remington Arms Co. v. Liberty Mut. Ins. Co.*, 810 F. Supp. 1420 (D. Del. 1992).[9]

EMS has attempted to meet the burden (or rather to demonstrate on summary judgment that it *could* meet that burden) of demonstrating the existence and terms of a Travelers policy in the relevant period. To do so, it has introduced indirect evidence. That indirect evidence, outlined in more detail above, consists of four documents, plus an expert opinion:

(1) the "Ledger Pages," handwritten ledger pages claimed to refer to payments to or refunds from Travelers in 1947–48, 1948–49, 1949–50, and 1963–64;

(2) the "Fireman's Application," a 1964 application to Fireman's Fund that refers to a 1958 bodily injury claim previously settled by Travelers;

(3) the "Fireman's Note," a handwritten note allegedly from the underwriting file of Fireman's Fund Insurance Company ("Fireman's Fund"), which says "Travelers previously on line for about 40 years";

---

[9]     New Jersey has declined to adopt the clear-and-convincing standard that has been applied in other jurisdictions, such as New York. *Id.* at 603–04, 728 A.2d at 227–28 (citing other jurisdictions' case law). Travelers accepts *arguendo* that New Jersey law applies, but notes that EMS, although now headquartered in New Jersey, was headquartered in New York during the relevant period. I make the plaintiff-friendly assumption that New Jersey's preponderance standard applies.

The application of the preponderance standard presumes that neither party brought about the loss of the policy through its own misconduct. *See Sayreville*, 320 N.J. Super. at 604, 728 A.2d at 228 (citing *Remington*, 810 F. Supp. at 1426); *see also J.T. Baker v. Aetna Cas. & Sur. Co.*, 1996 WL 451316 (D.N.J. August 5, 1996) (following *Remington* and applying preponderance standard where the fraud-prevention rationale underlying the clear-and-convincing standard was not in play). There is no allegation here that any policy is missing because of fraud or other misconduct.

The parties do not fundamentally disagree as to EMS's initial preponderance burden of proof, as set forth in text. (*Compare* Def. Br. 22–23 *with* Pl. Br. 19–20) EMS asserts that once its initial burden of proof is met, the burden shifts to Travelers to demonstrate that certain risks were excluded from a standard policy, *e.g.,* by endorsement, or that other insurance applies. (*See* Pl. Br. 32–33) I do not reach this issue.

(4) the "Travelers Policy Forms," samples of forms used by Travelers in the relevant period.

(5) the Opinion of EMS's expert in "insurance archaeology," Henry R. Booth.

## B.     Discussion

I discuss this evidence in relation to three essential questions: Did a Travelers property damage policy cover EMS? If so, for what years was it in effect? What were its essential terms and policy limits? To be sure, EMS's documentary evidence is scanty. I find, however, that this evidence, as supplemented by the expert opinion of Mr. Booth, is barely sufficient to repel Travelers' summary judgment motion.

EMS's foundational evidence of property damage coverage is contained in the Ledger Pages. These contain scattered references to "Travelers," together with numbers that could be construed favorably to EMS as Travelers policy numbers. Those references, culled from Ledger Pages ("LP") 529, 554, 560, and 1362, are here placed in chronological order and designated [a] – [f] for ease of reference:

[a] DS 2646587 (4/1/48–4/1/49) from LP1362, "Chlorine"

[b] HP 81724 (1/13/49–1/13/50) from LP 529, "Tenants Liability"

[c] DS 330528 (4/1/49–4/1/50) from LP 1362, "Chlorine"

[d] DS 179924 (4/1/62–4/1/63) from LP 560, "Mfrrs. Liability"

[e] KDS 822846 (4/1/63–4/1/64) from LP 554, unspecified

[f] KDS 1747699 (4/6/64–4/1/65) LP 554, "Public Liability"

Property damage coverage does not appear on the face of the shorthand designations following these entries. They are nothing more than notations in the financial ledgers of EMS or SCC, presumably put there by an accountant or bookkeeper; at any rate, they are not attributable to Travelers. EMS's own witnesses state that "Chlorine" in [a] and [c] probably refers to specialized coverage for the activities of SCC. They do not know what "Mfrrs. Liability" in

[d] means, although Cervino believes it must pertain to SCC, not EMS. "Tenants Liability" [b] and "Public Liability" [f] are likewise a mystery to the EMS witnesses. The remaining entry [e] contains no description.

Travelers cites cases in which documentary evidence of this kind was deemed insufficient to defeat the defendant insurer's motion for summary judgment. In those cases, however, there either was no expert opinion proffered, or the Court granted a *Daubert* motion to exclude it. *See Kleenit, supra; Canal Ins. Co. v. Montello, Inc.*, No. 10-CV-411-JHP-TLW, 2012 WL 4891699, at *1 (N.D. Okla. Oct. 15, 2012), *aff'd*, 632 F. App'x 448 (10th Cir. 2015). Certain of them, contrary to the law of New Jersey, impose a clear-and-convincing standard of proof as well. *See Coregis Ins. Co. v. City of Harrisburg*, 401 F. Supp. 2d 398, 404–5 (M.D. Pa. 2005); *Metlife Capital Corp. v. Westchester Fire Ins. Co.*, 224 F. Supp. 2d 374, 386–87 (D.P.R. 2002); *Parker-Hannifin Corp. v. Am. Motorists Ins. Co.*, 1990 U.S. Dist. LEXIS 20212 (D.N.J. July 24, 1990) (applying clear-and-convincing standard, but stating that result would be the same under preponderance standard).

Here, the difference is the expert opinion of Mr. Booth. Booth's opinion evidence, when added to the secondary evidence of coverage, suffices to create a triable issue.

It is true that the bookkeepers' notations in the ledgers do not adequately describe the nature of the insurance. Mr. Booth, however, opines (and Mr. Richardson seems to agree) that the Travelers DS and KDS prefixes imply a Manufacturers and Contractors (M&C) liability policy, and that the Travelers HP prefix implies an owner, landlord, and tenant (OL&T) policy.

It is true that these prefixes and the Travelers Policy Forms establish only that property damage coverage was an à la carte option—not that it was actually selected.[10] The Fireman's Fund documents, too, suggest that Travelers

---

[10]     These prefixes, then, at least do not *exclude* property damage coverage, as would have been the case for, *e.g.*, prefix UB (Workers' Compensation).

was "on line" for 40 years, and refer to a bodily injury claim dating from 1958, but do not directly establish property damage coverage. Mr. Booth expressed the opinion, however, that it would be unusual for a chemical manufacturer, given the risks of that business, to disclaim property damage coverage. The ordinary course would be to obtain coverage of bodily injury and third-party property damage liability in a single policy. This was corroborated by the replacement coverage that EMS obtained in 1964, after Travelers canceled, which included both bodily injury and property damage coverage.

It is true that three of the four Ledger pages come from the records of SCC, not EMS; that certain aspects of the coverage ("Chlorine", "Mfrrs.") appear to have particular application to SCC; and that there is no direct evidence that EMS and SCC were both named as insureds on the missing policies. Mr. Booth expressed an expert opinion, however, that OL&T policies typically express their coverage in relation to premises, and that here, those premises would surely have been the 120 Lister Street property. M&C policies, too, would typically cover activities on premises. Moreover, it is standard practice for a commercial tenant to include the owner as an insured on a liability policy; indeed, this is what was done when EMS and SCC obtained replacement coverage in 1964.

It is true that the Travelers coverage suggested by the Ledger Pages dates from 1948–50 and 1963–65, and that there are no relevant ledger entries between 1950 and 1963.[11] Mr. Booth has furnished an opinion, however, that the Travelers coverage was continuous through that period. That opinion was based in part on the Fireman's documents, which indicated that Travelers was on line for 40 years, and that Travelers covered a bodily injury claim in 1958. It also rested on Mr. Booth's expert opinion that Travelers did not usually "come in and out of a risk."

---

[11]     In response to requests for admissions, EMS states that it possesses no primary source documents that relate to any alleged Traveler policies in effect during 1945, 1946, or 1955–62. (TSMF ¶ 14)

Finally, it is true that the missing policies' dollar limits do not appear in the documentary evidence. Here, however, both Mr. Booth and Mr. Robertson have something to offer. Mr. Booth opines that the policy limit is $25,000. In support, he notes that the replacement coverage obtained by EMS in 1964 was in that amount.[12] EMS also cites the testimony of Travelers' expert, Mr. Robertson, that typical limits were "as high as" $5,000 per accident and $25,000 in the aggregate. (Pl. Br. 17) Actually, Robertson opined that basic property damage coverage in 1948–50 would have been $1000 per accident/$10,000 aggregate, and that by 1963–65 those amounts had increased to $5000/$25,000.

On this record, however, the policy limits cannot exceed $5000/$25,000. There is no evidence from which a rational fact finder could conclude that EMS, assuming it purchased property damage coverage at all, purchased any more than basic coverage. The basic property damage policy limits were $1000/$10,000 at the beginning of the relevant period, and increased to $5000/$25,000 by the end of the relevant period. EMS, opting for the higher figure, argues that the property damage coverage, through the *entire* 1948–65 period, "had policy limits of $25,000." (Pl. Br. 16) I disagree. On this record, the the limit was *at most* $5000 per accident/$25,000 aggregate, or possibly less, depending on the year in which the claim accrued. To that limited extent, Travelers' summary judgment motion is granted.

Travelers suggests that this Court make a ruling on summary judgment that EMS cannot establish that third-party property damage occurred before 1956. Such liability, the occurrence, and the timing of any liability-creating act are the subjects of litigation elsewhere. I will not make a ruling, based on incomplete information, that might have preclusive effect in other litigation.

---

[12]    Booth opined that typically, liability limits tend to be static from one year to the next. A mark-up, or renewal, might give rise to such an inference. *See, e.g., Kleenit,* 486 F. Supp. 2d at 131. But that inertial principle has little application where, as here, prior coverage has been canceled and the insured is seeking new coverage from a new insurer.

## CONCLUSION

For the foregoing reasons, Travelers' motion for summary judgment (ECF no. 109) is granted to the extent that the policy limits cannot exceed $5000 per accident/$25,000 aggregate. The motion is otherwise denied.

Dated:  January 18, 2017

KEVIN MCNULTY, U.S.D.J.